COMMONWEALTH *vs*. ARNOLD D. GABBIDON.

Norfolk. March 4, 1986. — July 10, 1986.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Assault with Intent to Kill. Practice, Criminal,* Instructions to jury, Argument by prosecutor. *Evidence,* Alias, Admitted without objection.

At the trial of indictments, including an indictment charging assault with intent to kill, no substantial risk of a miscarriage of justice resulted from the judge's erroneous instruction on specific intent to kill the victim, where the erroneous portion of the jury charge did not relate to an issue actively contested at trial. [4-5]

At the trial of indictments, including an indictment charging assault with intent to kill, no substantial risk of a miscarriage of justice resulted from the judge's charge to the jury that a wanton and reckless act was sufficient for conviction, where the evidence did not indicate wanton and reckless conduct, but conduct by the defendant calculated to take the victim's life. [5-6]

Testimony by a witness at the trial of indictments arising out of a shooting that he had personally observed people address the defendant by nicknames such as "Top Ranking," "Rankin," and "General" was properly admitted, not for the truth of any fact asserted outside of court, but because the fact that the defendant became known by those nicknames after the shooting was relevant to his motive in shooting the victim. [6-7]

No substantial risk of a miscarriage of justice resulted from the admission
of testimony at a criminal trial as to the defendant's nicknames, a vanity
plate attached to the front of his automobile, and a statement attributed
to him that "[t]his is the time for the revolution," alleged to have been
offered to appeal to the racial prejudices of the jury. [7]

A criminal defendant was not prejudiced by the prosecutor's remark in
closing argument that a police officer had testified "that all the informa-
tion [a certain informant] had given him in the past on other things
always turned out to be acccurate," where the general substance of the
statement was grounded in the evidence, and where any inaccuracy was
adequately remedied by the judge's instructions to the jury. [7-8]

INDICTMENTS found and returned in the Superior Court De-
partment on September 8, 1981.

After review by the Appeals Court, 17 Mass. App. Ct. 525
(1984), the cases were retried before *Rudolph F. Pierce, J.*

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Barry P. Wilson* for the defendant.

*Stephanie Martin Glennon,* Assistant District Attorney, for
the Commonwealth.

O'CONNOR, J. After a jury trial, the defendant was convicted
of assault with intent to kill, assault and battery by means of
a dangerous weapon, and unlawfully carrying a firearm. The
judge sentenced the defendant to two concurrent nine-to-ten
year terms on the convictions of assault with intent to kill and
assault and battery by means of a dangerous weapon. The
judge also imposed a four-to-five year sentence for the firearms
offense to be served from and after the expiration of the sentence
on the assault with intent to kill conviction. On appeal, the
defendant argues that a new trial is required[1] because: (1) the
judge's instruction regarding specific intent to kill was errone-
ous and created a substantial risk of a miscarriage of justice;
(2) the judge erred in admitting testimony about the defendant's
nicknames, vehicle plate, and statements made by the defend-

---

[1] The defendant's first trial ended in a mistrial. After a second trial, the
defendant's convictions were reversed on appeal, 17 Mass. App. Ct. 525
(1984). After this third trial, we transferred the defendant's appeal to this
court on our own motion.

ant; and (3) the prosecutor's closing argument was improper. We affirm the convictions.

We summarize the Commonwealth's evidence. On July 16, 1980, shortly after 2:00 A.M., John M. Fitzgerald was shot and permanently paralyzed while driving home from work on the Southeast Expressway. Fitzgerald testified that, after driving onto the expressway, he began to overtake a red, medium-sized or small American sports car. When his vehicle closed to within twenty yards of the red sports car, Fitzgerald saw a muzzle flash from within the interior of that vehicle. Fitzgerald fell on the front seat as a bullet went through his windshield. Fitzgerald then heard two more shots. Wounded, Fitzgerald managed to slow his vehicle before it crashed to a stop. An examination of Fitzgerald's vehicle after the shooting revealed a bullet hole in the front left fender, the driver's door, and the windshield. It was determined later that the bullets had been fired from a .45 caliber rifle.

The Commonwealth's chief witness was Errol Mohammed who resided in Roxbury near Walnut Park at the time of the shooting. Mohammed testified that on the night of July 16, 1980, the defendant, who lived in the same neighborhood, came to Mohammed's home and asked if he could watch the news on television. According to Mohammed's testimony, after the news report of the shooting concluded, the defendant stated, "That's me. I did it." Mohammed responded to that statement by asking the defendant, "How could you do something like that?" The defendant replied, "This is the time for the revolution." According to Mohammed, the defendant also explained that he had wanted to try out his "chopper." Mohammed testified that when the defendant used the term "chopper," he was referring to his machine gun. Mohammed also testified that in July, 1980, the defendant owned a red Trans Am automobile.

In addition to describing this conversation, Mohammed testified that prior to the shooting the defendant was "just another person," but after the shooting, the defendant was addressed as "Top Ranking," "Rankin" and "General." Mohammed testified that, at some point after the shooting, the defendant

affixed a vanity plate bearing the word "Rankin" to the front of his automobile. A photograph of the defendant's automobile with this vanity plate was introduced in evidence.

Mohammed did not reveal his knowledge of the shooting to the police for approximately one year after the incident. In June, 1981, Mohammed agreed to cooperate with the police, and thereafter Mohammed arranged a meeting between State Trooper Gilbert Bernard and the defendant to discuss the possibility of Bernard's purchasing the defendant's .45 caliber semi-automatic rifle. At a second meeting at the defendant's apartment, Bernard purchased the rifle for $700. The State police then performed a ballistics test on the weapon which was identified at trial as a .45 caliber Volunteer Commando Mark 3 semi-automatic rifle. The State police ballistician concluded that the jacket fragments recovered from Fitzgerald's vehicle were fired from the weapon purchased from the defendant.

1. *The Jury Instruction.*

With respect to the charge of assault with intent to kill, the judge instructed the jury in relevant part as follows: "The Commonwealth must prove that the attempted killing was intentional and was either an excessive response . . . to a reasonable provocation or that the intent to kill resulted from an intentional act which was wantonly and recklessly done, an act involving a high degree of likelihood that death might occur. By the use of the phrase wanton and reckless, I mean that grave danger must have been apparent to the defendant before he acted and that he nevertheless chose to run the risk of his actions rather than to alter his conduct. In other words, wanton and reckless conduct amounts to an indifference or a disregard to the rights of others and a disregard of the serious consequences which flow to another by the act which was done by the defendant."

The Commonwealth concedes that this aspect of the judge's jury charge is erroneous because it would permit the jury to convict the defendant without finding a specific intent to kill. *Commonwealth* v. *Henson,* 394 Mass. 584, 591 (1985). The defendant, however, did not object to the charge as given.

Therefore, the error committed is reversible error only if the instruction created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967).

To determine whether the erroneous instruction created a substantial risk of a miscarriage of justice, we must evaluate the impact of the error in the context of the entire trial. In the performance of this task, we pay particular attention to those issues actively contested at trial. We recognize that a defendant cannot relieve the Commonwealth of its burden of proving every element of a crime beyond a reasonable doubt by failing to contest an essential element of that crime at trial. However, whether a particular element of a crime was contested at trial is important to a determination whether a trial error resulted in a substantial risk of a miscarriage of justice. We have held previously that no harm accrues to a defendant if an error does not relate to an issue actively contested at trial. *Commonwealth* v. *Puleio,* 394 Mass. 101, 109 (1985). *Commonwealth* v. *Lee,* 383 Mass. 507, 512-513 (1981). Defense counsel reasonably did not object to the jury charge because whether the gunman possessed the specific intent to kill Fitzgerald was not a live issue in the case. The only live issue was the identity of the gunman. Because the erroneous instruction on specific intent to kill did not relate to an issue actively contested at trial, no substantial risk of a miscarriage of justice resulted from the erroneous portion of the jury charge. *Commonwealth* v. *Puleio, supra* at 109.

Furthermore, it is clear from a review of the evidence that no substantial risk of a miscarriage of justice resulted from the judge's charge that a wanton and reckless act was sufficient for conviction. The evidence does not indicate wanton and reckless conduct, but rather conduct calculated to take Fitzgerald's life. There was evidence at trial that the defendant fired three shots from a powerful semi-automatic rifle. The three shots pierced Fitzgerald's vehicle in an area proximate to the passenger compartment of the automobile, wounding Fitzgerald. Contrary to the defendant's assertion that the jury could have found the shots to be "aimless 'pot shots'" fired for the purpose of terrorizing Fitzgerald, the location of the

bullet holes close to the driver of a fast-moving automobile and the type of weapon chosen for the task clearly demonstrate that the defendant intended to kill Fitzgerald. We conclude, therefore, that no substantial risk of a miscarriage of justice resulted from the jury instruction.

2. *The Admission of Certain Evidence.*

The defendant argues that evidence about the defendant's nicknames, vanity plate, and statement, "This is the time for the revolution," should not have been admitted. The defendant argues first that the judge improperly overruled his objection that Mohammed's testimony about the defendant's nicknames constituted inadmissible hearsay. The relevant portion of Mohammed's testimony is set forth in the margin.[2] The judge correctly overruled the defendant's objection because Mohammed's testimony about the defendant's nicknames did not involve hearsay statements. The testimony was admitted because the fact that the defendant became known by those nicknames after the shooting was relevant to his motive in shooting Fitzgerald. It was not admitted for the truth of any fact asserted outside of court. Nor did Mohammed testify that someone else told him about the defendant's nicknames as in *Commonwealth v. Sheline,* 391 Mass. 279, 286 (1984) (statement "aka Howie Tuna" on laboratory certificate inadmissible hearsay). He testified, instead, that he had personally observed people address the defendant by nicknames such as "Top Ranking," "Rankin," and "General." That is not hearsay. *Commonwealth v. Leaster,*

---

[2] THE PROSECUTOR: "Now, after the shooting, after July 16, 1980, would you ever have occasion to be in Walnut Park when Arnold Gabbidon was there?"

THE WITNESS: "Yes."

THE PROSECUTOR: "And when you were there and you saw Arnold Gabbidon there, did you see any people address him?"

THE WITNESS: "Yes."

THE PROSECUTOR: "And could you tell the jury how they addressed him after the shooting?"

THE WITNESS: "Top Ranking."

THE PROSECUTOR: "Top Ranking?"

THE WITNESS: "Yes."

THE PROSECUTOR: "Anything else?"

THE WITNESS: "Rankin, General, stuff like that."

362 Mass. 407, 411-412 (1972). *Campinha* v. *James J. Devine, Inc.,* 1 Mass. App. Ct. 482, 485 (1973).

The defendant argues next that evidence of his nicknames, vanity plate, and statement, "This is the time for the revolution," should have been excluded because that evidence was offered to appeal to the racial prejudices of the jury. The defendant does not argue that those items of evidence were irrelevant. Instead, the defendant's argument is that the probative value of that evidence is outweighed by its unfairly prejudicial nature. The defendant, however, failed to object at trial to the introduction of evidence about his vanity plate and statement. Furthermore, his only objection to Mohammed's testimony about the defendant's nicknames was that it constituted inadmissible hearsay. While the defendant made a motion in limine prior to trial to prevent the introduction of these items on the ground that undue prejudice would accrue to the defendant, that motion alone is insufficient to save appellate rights. See *Freyermuth* v. *Lutfy,* 376 Mass. 612, 616 (1978) ("The consequence of the failure to object is to waive the objection to the testimony"). In the absence of proper objections at trial, our review is limited to a determination whether the alleged errors created a substantial risk of a miscarriage of justice, and the defendant does not now argue, properly it seems, that the admission of that evidence resulted in a substantial risk of a miscarriage of justice.

3. *The Prosecutor's Closing Argument.*

Finally, the defendant argues that his convictions must be reversed because the prosecutor referred to matters not in evidence during his closing argument to the jury. According to the defendant, the prosecutor erroneously stated that "[Officer] Powers [testified] that all the information Mohammed had given him in the past on other things always turned out to be accurate." The defendant objected to this statement, and at the close of the prosecutor's argument requested a mistrial. The judge overruled the objection and instructed the jury that it was their memory of the evidence that counted. The judge also denied the motion for a mistrial. The defendant contends that the prosecutor repeated the substance of this initial misstatement

five times.[3] Because Mohammed's credibility was crucial to the Commonwealth's case, the defendant argues, these misstatements regarding Mohammed's reliability as an informant on other matters severely prejudiced the defendant.

Although there was no direct evidence that Mohammed's past tips had proved accurate, there was ample evidence that Mohammed had provided information to the police on other occasions. Furthermore, there was evidence introduced that corroborated much of Mohammed's testimony. For example, a photograph of the defendant's automobile with the vanity plate "Rankin" affixed to the front was introduced in evidence. Also, the testimony of Trooper Powers and Trooper Bernard about the purchase of the defendant's rifle was consistent with Mohammed's version of the transaction. Thus, while the prosecutor's statements were inaccurate in some respects, the general substance of the statements was grounded in the evidence.

Furthermore, any inaccuracy in the prosecutor's closing argument was adequately remedied by the judge's curative instruction to the jury during the prosecutor's argument and by the judge's instructions to the jury at the end of the case. On two occasions, the judge admonished the jury that their memory of the evidence was controlling. In his closing remarks to the jury, the prosecutor made similar statements. Thus, we are satisfied that the defendant was not prejudiced by any error committed by the prosecutor during closing argument. *Commonwealth* v. *Daigle,* 379 Mass. 541, 550 (1980). *Commonwealth* v. *Jones,* 9 Mass. App. Ct. 103, 119 (1980).

*Judgments affirmed.*

---

[3] The defendant identifies the following additional misstatements:

1. "[I]t is my recollection that Trooper Powers testified that the information Mohammed had given him in the past always turned out to be accurate."

2. "He was corroborated by Trooper Powers at least as to his veracity on other occasions . . . ."

3. "He was corroborated by Trooper Gil Bernard and by Trooper Powers. He was independently corroborated."

4. "And, again, as I said, Trooper Powers testified he has always proven himself to be accurate to him."

5. "Again, he is corroborated by . . . Trooper Powers."